UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRINIDAD RAMOS, an individual; DIANA RAMOS, an individual; and ERIC L. RAMOS, an individual,<br><br>Plaintiffs,<br><br>v.<br><br>FUNDING RUSH, INC., a California Corporation; ANDREW ADRIAN DIOLI, an individual; RALPH MARTINEZ, an individual; JAY TURNER, an individual; LENNAR TITLE, INC., a California Corporation; LIL' WAVE FINANCIAL, INC., a Nevada Corporation, doing business as SUPERIOR LOAN SERVICING; LEXINGTON MORTGAGE COMPANY, doing business as LEXINGTON; SPIROS CHENG, an individual; RICHARD BARNES, an individual; KATHERINE HEFTMAN, an individual; SILICON PRIVATE CAPITAL, LLC; BETHANY DIOLI, an individual; and DOES 1–50,<br><br>Defendants. | No. 1:23-cv-01016-KES-HBK<br><br>ORDER GRANTING DEFENDANT LENNAR TITLE, INC.'S MOTION TO DISMISS<br><br>(Doc. 32) |

Defendant Lennar Title, Inc. ("Lennar"), an escrow company, moves to dismiss each of plaintiffs Trinidad, Diana, and Eric Ramos's fourteen claims pleaded against Lennar. Doc. 32

1

("MTD"). For the reasons explained below, the Court grants the motion.

I.    **Background**[1]

This is an action brought by plaintiffs Trinidad Ramos, Diana Ramos, and Eric Ramos against a group of defendants who allegedly deceived plaintiffs into refinancing the mortgage on their home on terms that were extremely unfavorable to plaintiffs. *See* Doc. 21 (First Amended Complaint ("FAC")). The defendants are: (1) the loan brokers who arranged the transaction: Funding Rush, Inc. ("Funding Rush"), which is owned by defendant Andrew Dioli, and Lexington Mortgage Company ("Lexington"), which is owned by defendant Spiros Cheng, *id.* ¶¶ 8–9, 12, 13–15; (2) the lenders: Richard Barnes, Katherine Heftman, and Silicon Private Capital LLC, which is owned by defendant Bethany Dioli (the wife of Andrew Dioli), *id.* ¶¶ 10–12, 16–17; (3) Ralph Martinez and Jay Turner, two individuals who were employees of both Funding Rush and Lexington, *id.* ¶¶ 18–19; (4) the loan servicer: Lil Wave Financial, Inc., *id.* ¶ 7; and (5) the escrow company: Lennar Title, Inc. ("Lennar"), *id.* ¶ 20.

Trinidad and Diana Ramos are an elderly couple who own a home at which they have resided since 2006. *Id.* ¶ 3. Trinidad and Diana struggled financially following the onset of their daughter's terminal illness and following Trinidad's need for three knee surgeries, which forced him into retirement. *Id.* ¶¶ 36–49. By June 2022, Trinidad and Diana had accumulated approximately $20,000 in medical debt which they were unable to pay. *Id.* ¶¶ 36–39, 49–50. Trinidad and Diana earn a combined monthly income of $3,664 from Diana's retirement benefits and Trinidad's Social Security benefits. *Id.*

In June 2022, Trinidad received an unsolicited call from Ralph Martinez, who represented himself as an employee of Lexington, a loan broker. *Id.* ¶ 50. Martinez told Trinidad that he had been a loan officer for thirty years and had helped many people in situations similar to Trinidad and Diana's – people with large medical debts and low credit scores. *Id.* Martinez inquired about the terms of Trinidad and Diana's current mortgage and learned that it had the following terms:

---

[1] This recitation of facts is taken from plaintiffs' first amended complaint. Doc. 21. These allegations are assumed to be true for the purposes of the pending motion. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). To avoid confusion, this Order follows the complaint in referring to plaintiffs Trinidad Ramos and Diana Ramos by their first names.

1  (1) the interest rate was 2.0005%; (2) the monthly payment was $1,690.20, and this monthly
2  payment included principal, interest, real property taxes, homeowner's insurance, and a solar
3  lease; (3) the maturity date was June 1, 2036; and (4) the loan was a purchase money loan, which
4  meant that the lender could not seek a deficiency judgment if Trinidad and Diana defaulted. *Id.*
5  ¶ 51. Martinez told Trinidad that he could help Trinidad and Diana refinance their mortgage by
6  obtaining a loan that would pay off their prior mortgage, provide a $50,000 cash payment which
7  Trinidad and Diana could use to pay their $20,000 medical debt, and that would have lower
8  monthly payments than Trinidad and Diana made on their mortgage at that time. *Id.* ¶ 54.
9  Martinez assured Trinidad and Diana that they were "in good hands" and that the process would
10 be fast and simple so that they could focus on spending time with their dying daughter and caring
11 for their granddaughter. *Id.* ¶¶ 55–56. Based on these representations, Trinidad and Diana agreed
12 to work with Martinez to obtain the refinance loan. *See id.* ¶¶ 57–59.

13 Over the course of the next two months, Martinez, Jay Turner, and Lexington
14 (collectively, the "Lexington defendants") repeatedly reassured Trinidad and Diana that they
15 could obtain the refinance loan on the terms Martinez had represented so long as they agreed to
16 each of the things that the Lexington defendants requested that they do, and Trinidad and Diana
17 placed their trust in the Lexington defendants. *See id.* ¶¶ 59–62, 64–67. At the Lexington
18 defendants' request, Trinidad and Diana added their son, Eric Ramos, to the loan application. *Id.*
19 ¶ 60. Plaintiffs then signed the loan application and a Mortgage Loan Disclosure Statement. *Id.*
20 ¶¶ 64, 66–69. The Lexington defendants never explained the contents of the loan application or
21 Mortgage Loan Disclosure Statement and did not provide plaintiffs with a copy of either
22 document. *Id.*

23 Defendants selected Lennar as escrow holder. *Id.* ¶ 70. As escrow holder, Lennar held
24 and transferred escrow funds, prepared the Final Settlement Statement, promissory note, and deed
25 of trust, and closed the refinance loan. *Id.* ¶ 20. Plaintiffs allege that Lennar did not prepare an
26 estimated settlement statement or a draft of any of the other documents, so plaintiffs did not have
27 an opportunity to review and approve the documents before the final versions were sent for their
28 signature. *Id.* ¶¶ 71–74. Additionally, on the Final Settlement Statement, Lennar misrepresented

3

that Funding Rush, one of the loan brokers, was the lender. *Id.* ¶ 76; Doc. 21-1, Ex. 17 at 108. Plaintiffs allege that Lennar knew that Funding Rush was not the lender because Lennar also prepared the deed of trust and promissory note which identify only Richard Barnes, Katherine Heftman, and Silicon Private Capital LLC as the lenders. *Id.*; Doc. 21-1, Ex. 3 at 41.

Prior to the close of escrow, defendants sent a mobile notary to obtain plaintiffs' signatures on several loan documents: the promissory note, the deed of trust, a Declaration of Non-Owner Occupancy, and a document titled "Loan Type: PARTIAL AMORTIZATION—40 YEARS DUE IN TWO YEARS." *Id.* ¶ 83. The defendants did not explain the documents to plaintiffs, and the notary did not give plaintiffs an opportunity to review the documents and did not leave copies of the documents with plaintiffs. *Id.* ¶¶ 83–84. At the time they signed the documents, plaintiffs believed that the documents contained the terms that the Lexington defendants had represented to them. *Id.* ¶ 85.

Near the close of escrow, from August 18 through August 19, 2022, Martinez repeatedly asked Diana to electronically sign several other documents, even though Diana informed Martinez that she and Trinidad were in the hospital with their daughter. *Id.* ¶ 87. One of those documents was a Business Purpose of Loan Certification which was incorrectly dated July 1, 2022. *Id.* Plaintiffs were unable to read or understand the documents but signed them at Martinez's request. *See id.*

Escrow closed on August 22, 2022, and the Lexington defendants and Funding Rush asked plaintiffs to sign several other documents. *Id.* ¶¶ 88–91. One of those documents was an undated letter drafted by the Lexington defendants which stated that plaintiffs were taking a non-traditional loan to consolidate their debts and avoid imminent foreclosure. *Id.* The statements in the letter were false; Trinidad and Diana had been current on their prior mortgage and had never been threatened with foreclosure. *Id.*

On August 25, 2022, plaintiffs received the Final Settlement Statement from the Lexington defendants and Funding Rush. *Id.* Once they reviewed the Final Settlement Statement, plaintiffs learned that the terms of the refinance loan were far different from what the Lexington defendants had represented them to be. *Id.* ¶ 93. Plaintiffs learned that the refinance

1    loan was a business loan with an interest rate of 11.99%, the loan would be amortized over forty
2    years but would be due in two years with a balloon payment of $348,197.39, the monthly
3    payments were $3,615.85 for principal and interest alone, plaintiffs would receive only $10.45 in
4    cash rather than the $50,000 they were promised, broker fees of $27,855 were paid to Lexington
5    and Funding Rush, the default interest rate was 17.99%, the loan was a recourse loan which
6    would allow the lenders to seek a deficiency judgment against plaintiffs if they defaulted, and
7    defendants had paid off numerous other loans and liens on plaintiffs' home so that they could
8    generate high broker fees and would be in a first priority position if plaintiffs defaulted. *Id.* ¶ 94.

9    Once they learned of the true terms of the loan, plaintiffs contacted defendants and told
10   them that they wished to rescind the loan. *See id.* ¶¶ 95–96. Defendants stated that they would
11   follow up with a formal response but never called plaintiffs back. *Id.* Plaintiffs eventually called
12   the Lexington defendants, and the Lexington defendants told them that it was "too late" to rescind
13   the loan. *Id.*

14   Plaintiffs defaulted on the loan and received a notice of default on February 10, 2023. *Id.*
15   ¶¶ 105–08. A Trustee's Sale of plaintiffs' home was set for July 13, 2023. *Id.*

16   On June 20, 2023, plaintiffs filed a complaint in Fresno County Superior Court, and
17   defendants removed the action to this Court on July 5, 2023. Doc. 1. Plaintiffs filed a first
18   amended complaint on July 10, 2023. FAC. This Court entered a temporary restraining order
19   preventing the sale, Doc. 29, and later, a preliminary injunction against all defendants except
20   Lennar, enjoining them from forcing a sale of the property or in any other way attempting to
21   obtain possession of the property until the merits of plaintiffs' claims could be decided, *see* Doc.
22   57.

23   Lennar moves to dismiss the fourteen claims asserted against it in the first amended
24   complaint. *See* MTD. Those claims are: (1) failure to disclose in violation of the Truth in
25   Lending Act ("TILA") and the Real Estate Settlement Procedures Act ("RESPA"), FAC ¶¶ 116–
26   20; (2) misrepresentation in violation of TILA and RESPA, *id.* ¶¶ 121–25; (3) concealment in
27   violation of TILA and RESPA, *id.* ¶¶ 126–29; (4) negligence, *id.* ¶¶ 130–38; (5) fraud, *id.*
28   ¶¶ 139–47; (6) rescission of loan, *id.* ¶¶ 148–59; (7) financial elder abuse, *id.* ¶¶ 160–67;

1  (8) cancellation of instrument, *id.* ¶¶ 184–87; (9) declaratory judgment, *id.* ¶¶ 188–93;

2  (10) rescission of promissory note and deed of trust procured by fraud under California Civil

3  Code §§ 1692, 1572, 1689(b)(1), 1710, and 3333, *id.* ¶¶ 194–200; (11) deed of trust procured by

4  mistake, *id.* ¶¶ 201–06; (12) intentional infliction of emotional distress, *id.* ¶¶ 207–14; (13) quiet

5  title, *id.* ¶¶ 215–19; and (14) unjust enrichment, *id.* ¶¶ 220–27. Plaintiffs filed an opposition,

6  Doc. 46 ("Opp'n"), and Lennar filed a reply, Doc. 58 ("Reply").

**II.    Legal Standard**

The purpose of a motion to dismiss pursuant to Rule 12(b)(6) is to test the legal sufficiency of the complaint. *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). A plaintiff is required to allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The complaint must contain facts that "nudge [the plaintiff's] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

In determining whether a complaint states a claim on which relief may be granted, the court accepts as true the allegations in the complaint and construes the allegations in the light most favorable to the plaintiff. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984). A court may also "consider certain [other] materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice." *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). However, the court need not assume the truth of legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 680. While Rule 8(a) does not require detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678. A pleading is insufficient if it offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555; *see also id.* at 678 ("Threadbare recitals of the elements of a cause of action,

6

supported by mere conclusory statements, do not suffice."). Moreover, it is inappropriate to assume that the plaintiff "can prove facts that it has not alleged or that the defendants have violated the . . . laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

**III.     Discussion and Analysis**

Lennar moves to dismiss each of the fourteen claims asserted against it. *See* MTD. The Court grants the motion in full for the reasons explained below.

### a. State Law Claims

Plaintiffs assert numerous state law tort claims against Lennar: negligence, fraud, financial elder abuse, intentional infliction of emotional distress, and unjust enrichment. *See* FAC ¶¶ 130–47, 160–67, 207–14, 220–27. Each fails to state a claim.

While an escrow holder is a fiduciary of the parties to the escrow, the "agency created by the escrow is limited—limited to the obligation of the escrow holder to carry out the instructions of each of the parties to the escrow." *Summit Fin. Holdings, Ltd. v. Cont. Lawyers Title Co.*, 27 Cal. 4th 705, 711 (Cal. 2002). "Absent clear evidence of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions." *Id.* (citing *Lee v. Title Ins. & Trust Co.*, 264 Cal. App. 2d 160, 162 (Cal. Ct. App. 1968). Moreover, "an escrow holder 'has no general duty to police the affairs of its depositors.'" *Id.* (quoting *Claussen v. First Am. Title Guaranty Co.*,186 Cal. App. 3d 429, 435-436 (Cal. Ct. App. 1986)). Even if an escrow holder is aware of facts that suggest one of the parties to the escrow is defrauding the other, the escrow holder has no fiduciary duty to disclose those facts if the escrow instructions do not require it to do so. *Lee*, 264 Cal. App. 2d at 161–63.

Here, plaintiffs have not alleged anything concerning the escrow instructions, much less that Lennar failed to comply with those instructions. *See generally* FAC. Accordingly, each of plaintiffs' state law tort claims against Lennar fail unless there is "clear evidence of fraud" on Lennar's part. *Summit Fin. Holdings*, 27 Cal. 4th at 711; *see Lee v. Escrow Consultants, Inc.*, 210 Cal. App. 3d 915, 924–25 (Cal. Ct. App. 1989) (finding that a plaintiff successfully pleaded a fraud cause of action against an escrow company that allegedly conspired with lenders to commit

1  fraud).

2  Under California law, the "indispensable elements of [] fraud [] include a false
3  representation, knowledge of its falsity, intent to defraud, justifiable reliance, and damages."
4  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1105 (9th Cir. 2003). Federal Rule of Civil
5  Procedure 9(b) "demands that, when averments of fraud are made, the circumstances constituting
6  the alleged fraud 'be specific enough to give defendants notice of the particular misconduct . . .
7  so that they can defend against the charge and not just deny that they have done anything
8  wrong.'" *Id.* (quoting *Bly-Magee v. California*, 236 F.3d 1014, 1019 (9th Cir. 2001)).
9  "Averments of fraud must be accompanied by 'the who, what, when, where, and how' of the
10  misconduct charged." *Id.* (quoting *Cooper v. Pickett,* 137 F.3d 616, 627 (9th Cir. 1997)). "[A]
11  plaintiff must set forth *more* than the neutral facts necessary to identify the transaction. The
12  plaintiff must set forth what is false or misleading about a statement, and why it is false." *Decker
13  v. GlenFed, Inc. (In re GlenFed, Inc. Sec. Litig.),* 42 F.3d 1541, 1548 (9th Cir.1994).

14  Throughout the first amended complaint, plaintiffs primarily discuss actions of defendants
15  other than Lennar. *See* FAC ¶¶ 1–70, 82–227. The only specific actions of Lennar discussed in
16  the first amended complaint are: (1) Lennar did not have plaintiffs review, approve and sign the
17  Final Settlement Statement or leave a copy of it with plaintiffs, *see* FAC ¶ 72; (2) Lennar did not
18  provide plaintiffs a draft of the promissory note or deed of trust, *id.* ¶¶ 73–74; (3) Lennar did not
19  explain, advise or counsel plaintiffs regarding the loan documents, *id.* ¶¶ 83–84; and (4) Lennar
20  misrepresented that Funding Rush was the lender, rather than the loan broker, on the Final
21  Settlement Statement, *id.* ¶ 76. The first three of these allegations do not include a false
22  representation, and these actions therefore cannot support plaintiffs' allegations of fraud, *Vess*,
23  317 F.3d at 1105, particularly as plaintiffs do not allege that the escrow instructions required
24  Lennar to provide the Final Settlement Statement, promissory note, or deed of trust to plaintiffs or
25  explain it to them, *cf. Lee v. Escrow Consultants, Inc.*, 210 Cal. App. 3d 915, 925 (Cal. Ct. App.
26  1989) (suggesting that an escrow company's nondisclosure of certain facts that it was required by
27  the escrow instructions to disclose can satisfy the false representation element of a fraud claim).

28  While plaintiffs do allege that Lennar "misrepresented Funding Rush as the lender," *id.*

8

¶ 76, this allegation is insufficient to support plaintiffs' fraud claim because it does not satisfy the reliance element. *See Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (Cal. 1995) (explaining that a plaintiff cannot state a claim for fraud unless she shows that she reasonably relied on a defendant's false representation by altering her legal relations). Plaintiffs assert that this misrepresentation harmed them because Funding Rush, which is owned by defendant Andrew Dioli, charged plaintiffs $13,795 as a broker, even though the only work performed by Funding Rush was its arrangement of a $49,000 loan from Silicon Private Capital LLC, which is owned by defendant Bethany Dioli, Andrew's wife. *See id.* ¶¶ 77–80. Plaintiffs thus appear to argue that they were harmed by Lennar's misrepresentation because, if they had known that Funding Rush was simply obtaining the money from an affiliated company, plaintiffs would not have agreed to the $13,795 broker fee. *See id.*

The problem with this argument is that the Final Settlement Statement, which is attached to the complaint, says that Funding Rush is both the loan broker and the lender. Doc. 21-1, Ex. 17 at 108–110. Therefore, a review of the Final Settlement Statement should have led plaintiffs to believe that Funding Rush had charged $13,795 as a broker fee to obtain a $49,000 loan from itself. This would raise the same concern as charging $13,795 as a broker fee to obtain a loan from an affiliate – in both scenarios, such a fee would be disproportionate to the work performed. "Reliance [only] exists when the misrepresentation or nondisclosure was an immediate cause of the plaintiff's conduct which altered his or her legal relations, and when without such misrepresentation or nondisclosure he or she would not, in all reasonable probability, have entered into the contract or other transaction." *Alliance Mortg. Co.*, 10 Cal. 4th at 1239. Plaintiffs fail to show that there is a reasonable probability that, had they known that Funding Rush was obtaining the money from an affiliate, rather than from itself, they would not have entered into the contract. Accordingly, plaintiffs fail to state a claim for fraud against Lennar on this basis.

Plaintiffs attempt to work around these problems by alleging a sprawling theory of agency liability that reaches far beyond the terms of the limited agency relationship created by the escrow agreement. Plaintiffs allege that "each of the Defendants was the agent, joint venturer and

employee of each of the remaining Defendants, and in doing the things hereinafter alleged, each was acting within the course and scope of said agency, employment and joint venture with the advance knowledge, acquiescence or subsequent ratification of each and every remaining cross-defendant." FAC ¶ 24. Further, plaintiffs allege that "each Defendant conspired with the other Defendants, and aided and abetted the acts and omissions to act of the other Defendants." *Id.* ¶ 26. Simply put, plaintiffs allege that Lennar and the other defendants "engaged in a ring to defraud innocent consumers/homeowners," *id.* ¶ 33, and each should be held liable for the others' actions. *See* Opp'n at 12–13.

"The essential characteristics of an agency relationship . . . are as follows: (1) [a]n agent or apparent agent holds a power to alter the legal relations between the principal and third persons and between the principal and himself; (2) an agent is a fiduciary with respect to matters within the scope of the agency; and (3) a principal has the right to control the conduct of the agent with respect to matters entrusted to him." *Garlock Sealing Techs., LLC v. NAK Sealing Techs. Corp.*, 148 Cal. App. 4th 937, 964 (2007) (quoting *Alvarez v. Felker Mfg. Co.*, 230 Cal. App. 2d 987, 999 (1964)). "Although the precise details of the agency relationship need not be pleaded to survive a motion to dismiss, sufficient facts must be offered to support a reasonable inference that an agency relationship existed." *Kreiser v. Asset Mgmt. Grp., Inc.*, No. 20-cv-01794-JVS-DFM, 2021 WL 3579414, at *3 (C.D. Cal. Apr. 23, 2021) (citing *Imageline, Inc. v. CafePress.com, Inc.*, No. 10-cv-9794-PSG-MAN, 2011 WL 1322525, at *4 (C.D. Cal. Apr. 6, 2011)). "Moreover, a plaintiff must allege facts demonstrating the principal's control over its agent." *Woo. v. United Express Group*, 2023 WL 63872255, at *5 (E.D. Cal. Sept. 29, 2023) (quotations omitted).

There are no facts in the complaint which could plausibly establish the existence of an agency relationship or conspiracy between Lennar and the other defendants along the lines of what plaintiffs allege. Plaintiffs' conclusory allegations that each defendant was the other's agent and that the defendants conspired are entirely unsupported by further factual allegations. Plaintiffs point to *Garton v. Title Ins. & Trust Co.*, 106 Cal. App. 3d 365 (Cal. Ct. App. 1980), for the proposition that "an allegation of agency is an allegation of ultimate fact and is, of itself, sufficient to avoid" dismissal. Opp'n at 12. There, the California Court of Appeal held that a

plaintiff's bare allegation "that each of the defendants were the agents and employees of each other and were acting in the course and scope of their agency, employment and authority and with the permission and consent of their codefendants in committing the acts alleged" was "a sufficient allegation of an agency relationship" to defeat a motion to dismiss. *Garton*, 106 Cal. App. 3d at 376; *see also Skopp v. Weaver*, 16 Cal. 3d 432, 437 (Cal. 1976); *Dones v. Life Ins. Co. of N.A.*, 55 Cal. App. 5th 665, 685 (Cal. Ct. App. 2020). To the extent plaintiffs rely on state cases in arguing that the FAC's generic language sufficiently pleads an agency relationship, the California Supreme Court has noted – quoting the exact language used in plaintiffs' complaint – that plaintiffs' agency "allegations are egregious examples of generic boilerplate . . . ." *Moore v. Regents of Univ. of Cal.*, 51 Cal. 3d 120, 134 n.12 (Cal. 1990).

In any event, plaintiffs fail to comply with federal pleading standards. "Pleading in federal court is governed by Federal Rules of Civil Procedure, not state pleading requirements." *Miller v. Sawant*, 18 F.4th 328, 337 (9th Cir. 2021); *see also Vess*, 317 F.3d at 1103 ("'[W]hile a federal court will examine state law to determine whether the [substantive] elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule.'"). Under Rule 12(b)(6), plaintiffs are required to do more than "offer[] labels and conclusions," and "naked assertions devoid of further factual enhancement" are insufficient. *Iqbal*, 556 U.S. at 678. Indeed, plaintiffs' conclusory allegation that "each of the Defendants was the agent . . . of the remaining defendants" bears a striking resemblance to the plaintiffs' allegations in *Twombly* that the defendants had "engaged in a contract, combination, or conspiracy and agreed not to compete with each other," which the *Twombly* Court held were "merely legal conclusions . . . ." *Twombly*, 550 U.S. at 564 & n.9. Plaintiffs have failed to plead an agency relationship between Lennar and the other defendants consistent with Rule 12(b)(6), much less the more demanding requirements of Rule 9(b).

In sum, as plaintiffs have failed to allege a lack of compliance with the escrow instructions, failed to allege clear evidence of fraud on Lennar's part, and failed to allege an agency relationship that would render Lennar liable for the allegedly fraudulent acts of the other

11

defendants, each of plaintiff's state law tort claims must be dismissed. *Summit Fin. Holdings*, 27 Cal. 4th at 711 ("Absent clear evidence of fraud, an escrow holder's obligations are limited to compliance with the parties' instructions.").

### b. Truth in Lending Act Claims

TILA, 15 U.S.C. § 1601, *et seq.*, was enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). To accomplish these purposes, TILA requires "creditors" to make certain disclosures before extending credit to a consumer. *Id.* §§ 1631–1639; *Hauk v. J.P. Morgan Chase Bank USA,* 552 F.3d 1114, 1120 (9th Cir. 2009) ("TILA is only a disclosure statute and does not substantively regulate consumer credit but rather requires disclosure of certain terms and conditions of credit before consummation of a consumer credit transaction."). A creditor who fails to comply with TILA's disclosure requirements can be held liable for damages. *Id.* § 1640.

TILA defines "creditor" as "a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement." 15 U.S.C.A. § 1602. An escrow holder is therefore not a "creditor" under TILA, and TILA imposes no statutory duties on an escrow holder. *See, e.g.*, *In Re Ameriquest Mortg. Co.*, 589 F. Supp. 2d 987, 992 (N.D. Ill. 2008) (holding that "TILA burdens only creditors with disclosure obligations" and escrow companies are not "creditor[s]'); *Manuel v. Discovery Home Loans, LLC*, No. C 10–01185 JSW, 2010 WL 2889510, at *3 (N.D. Cal. July 22, 2010) (same); *Phleger v. Countrywide Home Loans, Inc.*, No. C 07-1686 SBA, 2008 WL 65771, at *6 (N.D. Cal. Jan. 4, 2008) (same). Accordingly, plaintiffs cannot state a TILA claim against Lennar.

### c. RESPA Claims

RESPA was enacted to guarantee that "consumers throughout the Nation are provided with greater and more timely information on the nature and costs of the settlement process and are protected from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country." 12 U.S.C. § 2601(a). RESPA therefore requires, through its various provisions, "more effective advance disclosure to home buyers and sellers of settlement costs"; "the elimination of kickbacks or referral fees that tend to increase unnecessarily the costs of certain settlement services"; "a reduction in the amounts home buyers are required to place in escrow accounts established to insure the payment of real estate taxes and insurance"; and "significant reform and modernization of local recordkeeping of land title information." 12 U.S.C. § 2601(b).

However, RESPA does not contain a private right of action for disclosure violations. *Altman v. PNC Mortg.*, 850 F. Supp. 2d 1057, 1074 (E.D. Cal. 2012). Additionally, courts have uniformly declined to find an implied right of action for disclosure violations. *See, e.g.*, *id.*; *Bloom v. Martin,* 865 F. Supp. 1377, 1385 (N.D. Cal. 1994), *aff'd,* 77 F.3d 318 (9th Cir. 1996). Given that RESPA includes private rights of action for other kinds of violations, *see* 12 U.S.C. §§ 2607–08, the statute should not be read to contain an implied right of action for disclosure violations. *See Sundance Land v. Community First Fed. Sav. & Loan,* 840 F.2d 653, 663 (9th Cir. 1988) ("[W]here Congress has carefully employed a term in one place and excluded it in another, it should not be implied where excluded."). RESPA's purpose is to "curb abusive settlement practices in the real estate industry[, and] [s]uch amorphous goals [] do not [necessarily] translate into a legislative intent to create a private right of action." *Bloom,* 865 F. Supp. at 1385.

Plaintiffs respond that courts have found that "RESPA does provide for a private right of action" and quote, at length, an excerpt from *In re Carter*, 553 F.3d 979 (6th Cir. 2009). However, the *Carter* court held only that the plaintiff had Article III standing to sue for a violation of the kickback provision of RESPA – a provision which *expressly* provides a private right of action, *see* 12 U.S.C. § 2607(d) – even though the plaintiff was not overcharged as a

13

result of the kickback. *In re Carter*, 553 F.3d at 988–89. The *Carter* court did not find an *implied* right of action in RESPA, and did not address a disclosure violation. *See id.* Accordingly, plaintiffs' RESPA claims fail.

### d. Rescission Claims

Plaintiffs also press various claims against Lennar that seek to either rescind the contract, establish plaintiffs' full ownership of the property, or prevent defendants from becoming unjustly enriched by obtaining ownership of the property. *See* FAC ¶¶ 148–59, 184–87,188–93, 194–200, 201–06, 215–19, 220–27. However, plaintiffs do not allege that Lennar was a party to the loan documents or that Lennar has any security interest in the property. As an escrow holder during the mortgage loan transaction, Lennar was merely a "third party" who received "documents and/or money . . . to be delivered on the occurrence of some condition." *Summit Fin. Holdings*, 27 Cal. 4th at 711. Without alleging that Lennar possesses an interest in the property, plaintiffs cannot obtain the remedy they seek with these claims from Lennar. Accordingly, plaintiffs' claims for rescission of loan, cancellation of instrument, declaratory judgment, rescission of promissory note and deed of trust procured by fraud, deed of trust procured by mistake, quiet title, and unjust enrichment fail.

## IV. Conclusion and Order

Based upon the foregoing, Lennar's motion to dismiss, Doc. 32, is **GRANTED** with leave to amend. Plaintiffs may file a second amended complaint that amends the allegations against Lennar consistent with the terms of this order within thirty (30) days of the filing of this Order.

IT IS SO ORDERED.

Dated:   July 8, 2025

UNITED STATES DISTRICT JUDGE

14